UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

UNITED STATES OF AMERICA

v.

                               Case No.      5:08-cr-37-Oc-10GRJ

IAN DAVID DUNFEE

_____

## REPORT AND RECOMMENDATION[1]

Pending before the Court is Defendant's Motion To Suppress (Doc. 21) to which the United States filed its Memorandum In Opposition. (Doc. 29.) An evidentiary hearing was held before the undersigned on October 28, 2008 and therefore the matter is ripe for review. For the reasons discussed below, Defendant's Motion To Suppress is due to be **DENIED**.

### I. Introduction

This case involves a two count indictment against Defendant charging him with: (1) knowingly distributing child pornography in violation of 18 U.S.C. §§ 2252A(a)(2)(B) and (b)(1); and (2) knowingly possessing child pornography in violation of 18 U.S.C. §§ 2252A(a)(5)(B) and (b)(2). Defendant seeks to suppress statements made to Lake County, Florida law enforcement officers on April 9, 2008, as well as Defendant's laptop computer and any information contained on the laptop computer. Defendant argues that the lead investigator, Detective Chris Loyko and Detective Jason Dunlap - who assisted

---

[1] Specific, written objections may be filed in accordance with 28 U.S.C. § 636, and Rule 6.02, Local Rules, United States District Court, Middle District of Florida, within ten (10) days after service of this document. Failure to file timely objections shall bar the party from a *de novo* determination by a district judge and from attacking factual findings on appeal.

in the questioning of Defendant - conducted a custodial interrogation without advising the Defendant of his rights under *Miranda v. Arizona*.[2] Defendant further contends that "[k]nowledge of the existence of the laptop computer and probable cause to seek a search warrant would not have been obtained but for Mr. Dunfee's responses to law enforcement questioning." (Doc. 21, page 1.)

## II. Evidence And Testimony[3]

Detectives Loyko and Dunlap testified as the primary witnesses for the United States. The Defendant's fiancee, Christina Falconer, also testified in support of Defendant's request that his statements and laptop computer be suppressed.

Detective Loyko is an experienced detective with the Lake County Sheriff's Office and a member of several task forces, including the Immigration and Customs Enforcement task force ("ICE") which was involved in the investigation of Defendant. According to Detective Loyko, the investigation began when he received a cyber tip from the Orange County Sheriff's Office regarding six images of child pornography that had been posted to a Yahoo group in September 2007. The IP address that was used to subscribe to the Yahoo group was from Defendant's residence and the profile information on the account used to post the information matched Defendant's general information (i.e., zip code). Detective Loyko learned that Defendant was a Lake County fire fighter at the Lake Gem station and he worked the "Charlie Shift." After contacting

---

[2] 384 U.S. 436, 478-79 (1966).

[3] The evidence is taken from the testimony at the October 28, 2008 hearing and the transcript of the recording of the April 9, 2008 interview entitled "Transcript of Ian Dunfee" and admitted at the hearing as Government's Exhibit 1. Citations to the interview transcript will be (T.) followed by the appropriate page citation.

Lake County to learn what hours Charlie shift had worked, Detective Loyko determined that the images had been posted at times when the Charlie Shift was not on duty.  On April 7, 2008, a state court judge in Lake County issued a search warrant for Defendant's residence at 34328 Donna Vista Place, Eustis, Florida.  After obtaining the search warrant, Detective Loyko notified Special Agent Anthony Wash, the case agent from ICE and Special Agent Roger Joseph, technical agent from ICE.

Detective Loyko decided that the search would be conducted on April 9, 2008 after Defendant had already left for work.  That morning, at about 7:00 a.m., Detective Loyko and Detective Dunlap arrived at the fire station, which is a converted home, to question Defendant.  Defendant's shift began at 8:00 a.m.  The Detectives were both dressed in button down shirts with a tie and each Detective had a firearm in a paddle holster on his right side.  Detective Loyko told Defendant's supervisor that they needed to talk to the on-coming shift about a call they had gone on a few days earlier. Detective Loyko testified that he was not honest about why they were there due to the nature of the allegations and because they were not yet certain about Defendant's involvement.

The Detective's first contact with Defendant was in the kitchen of the fire station where they found a group of fire fighters, including Defendant.  They asked Defendant to go outside to discuss a call that he had gone on a few days earlier.  The Detectives and Defendant exited the main part of the house and went into an enclosed weight room in the garage.  There was one door to the room; it was closed during the interview but not locked.  There was one window in the room, and they could see other fire fighters walking by.  The room housed several pieces of workout equipment and

Detective Loyko testified that it was a lot bigger than a five foot square. Detective Dunlap testified that it was a rectangular shaped room and approximately 10 feet by 20 feet in size. Detective Loyko sat down on a workout bench approximately four feet away from Defendant who was sitting on another piece of workout equipment. Detective Dunlap stood near the door, but neither of the Detectives blocked the door. Detectives Loyko and Dunlap both recorded the interview with digital recorders. Detective Loyko testified that he kept his recorder either in his pocket or on the workout bench directly in front of him.

Shortly after the interview began, Detective Dunlap left the room to advise the other law enforcement units (seven individuals, including Special Agent Joseph) to proceed with the search of Defendant's residence. When Detective Dunlap returned to the weight room he sat on a 10-gallon bucket near the door. Defendant was not advised of the search at his residence.

During the interview, Defendant repeatedly asked Detective Loyko if he was in trouble, if he was going to go to jail, if he was going to be arrested, if he was going to lose his job, and if he was going to lose his family. Detective Loyko told him that he hoped not; that they were trying to figure that out; that he was not trying "to jam" a firefighter up"; that they were "looking for honesty" and wanted to insure that the children of Lake County were safe; that he wasn't going to be arrested right then. (T. 3, 9, 15, 17-18-19, 21-22, 36-37, 39, 41-42, 50.) At one point during the questioning in the weight room, Defendant said, "Well I 'm done now at this point anyway right?" to which Detective Loyko responded:

Right now we're just talking. It's going to depend on the totality of everything. It

4

> really is.  Because if I wanted to arrest you I would've come in here and arrested you off the top of the bat.  But I wanted to sit down man to man and talk to you and see if we could find out what's going on.

(T. 36.)

Later Defendant asked "am I going to be arrested" and Detective Loyko said "[r]ight now no.  Right now we're talking." (T. 39.)   Detective Loyko explained that he could not tell Defendant what was going to happen because although Defendant had admitted to having images on his computer, they first needed to confirm that the images actually were on the hard drives.  Detective Loyko told Defendant that the pictures were not bad pictures compared to what he normally dealt with and that his biggest issue was insuring that Defendant did not take any of the pictures.   While the Detectives did not inform Defendant that he was free to leave, Detective Loyko testified at the hearing that Defendant could have left the fire station at any time.

Defendant explained that he has been looking at child pornography since he was thirteen or fourteen years old.  Defendant said that it had become a habit but that he was trying to move away from it.  Defendant stated that he has never touched a child or taken pictures of children.  Defendant admitted that he received one or two of the images, downloaded others from the internet and posted the six images to the Yahoo group. (T. 11-13.)  He advised the Detectives that his Dell computer had crashed a few months earlier and that the only computer working in the house was Ms. Falconer's laptop, which he had never used it to look at child pornography.   Defendant said that there were probably fifty to one hundred images on hard drives at his residence, along with movies and that there were a couple of bad things on the hard drives. Defendant told the detectives that currently there were ten to twenty child pornography

images in his email account – Sun_flower_fun2004a@yahoo.com--and that some of the images were bad.  Using Detective Loyko's laptop computer, Defendant unsuccessfully attempted to log-on to the account to show the Detectives the images.

Detective Loyko asked Defendant if he was willing to go to his residence to get the hard drives.  Defendant agreed but requested that they wait until Ms. Falconer left for work at 11:00 a.m.  Defendant said he would "do whatever [he] got to do" so that he would not lose his house, wife, family and career.  (T. 41.)  Defendant asked if there was any way that he could go to therapy so that he could keep his house, job, wife and family. (T. 54.)  Detective Loyko responded:

> [t]hat I cannot answer.  Is there a chance that you're probably gonna go to jail?  You even know the answer, yes.  I mean just plain and simple we're talking about child pornography.  You know it's against the law.  You know but there's also a chance you won't.  I mean it's hard, I can not answer you and say 'Ian, let's just go to jail right now.'  I can't, I can't do that.

(T. 55.)
Defendant again requested that they wait for Ms. Falconer to leave for work and Detective Loyko advised Defendant that a couple of detectives already were searching his residence.  Defendant immediately picked up his Nextel phone and attempted to call Ms. Falconer but he was unsuccessful.  Due to reception difficulties, Defendant said he was going to go outside and Detective Loyko said "[y]eah, sure go ahead."  (T. 57.)  Once outside, Detective Loyko called officers at Defendant's residence and they put Ms. Falconer on the phone.  Defendant walked around the fire station parking lot and then walked back into the fire station through the door in the garage and the door closed behind him.  Defendant was in the fire station for about a minute or two and the Detectives could not see Defendant while he was in the fire station.

Defendant came back outside and after some discussion with the Detectives he decided to tell his supervisor that he was leaving.  On his way back to the fire station - and without any prompting from the Detectives - Defendant stopped and turned around and advised the Detectives that he also had a Dell laptop in his vehicle with forty to fifty pornographic images and thirty to forty pornographic movies.  Defendant said that he wanted the Detectives to know that he was being honest.  Defendant went to his car and pulled out a Dell laptop. Defendant consented to the detectives searching his car. Detective Loyko testified that he had not known about the laptop and that he would not have found the laptop at Defendant's house because it was in his car.  Later that day, Detective Loyko used the information to get a search warrant to search for the images on the laptop.

Defendant went inside the firehouse unescorted to tell his supervisor that he needed to go home for a few minutes.   When Defendant came back outside, Detective Loyko asked if Defendant wanted to drive his own car or ride with them.  Defendant said he was "in no condition to drive" so he rode with the Detectives in Detective Loyko's unmarked patrol car.  (T. 62.)  Defendant sat in the front seat of the car and Detective Dunlap sat behind Defendant in the back seat.  Pursuant to department policy, Detective Loyko patted Defendant down.  Detective Loyko testified that he placed the digital recorder in the cup holder in front of the arm rest between himself and Defendant. During the approximately twenty-minute drive to his residence, Defendant spoke with Ms. Falconer two  times on his Nextel phone. In the car, Defendant asked if he was going to jail and Detective Loyko said if Defendant was being honest about the images and movies on his computers then he probably was going to jail. (R. 69-72.)   At no

point during the interview at the fire station or in the patrol car did Defendant say that he did not want to speak with the Detectives nor did he request a lawyer.

When they arrived at Defendant's residence, Defendant opened the door of the patrol car and got out. Defendant asked "should I be contacting a lawyer" and Detective Loyko said:

> That I can not answer. You're an adult. You have to make that decision on your own. I truly and honestly can not answer that question. We're not allowed to give legal advice. If you think you need one then yes.

(T. 80.)

Detective Loyko asked Defendant to fill out a consent form to search the laptop computer but Defendant did not complete the form. Defendant walked to the house by himself, went in and hugged Ms. Falconer. They sat in the family room together. At some point, Ms. Falconer went into the kitchen to clean up and Defendant changed his shirt in the bedroom. Approximately thirty minutes after arriving at the residence, Detective Loyko asked Defendant to come look at two images that Special Agent Joseph had located on one of Defendant's hard drives. Shortly thereafter, Detective Loyko read Defendant his Miranda rights. No further statements were made by Defendant.

### III. Analysis Of Issues

There is no dispute that neither Detective Loyko nor Detective Dunlap provided the Defendant with *Miranda* warnings until after they were at his residence. Defendant argues that because he was in custody during the questioning, his oral statements made to the Detectives, as well as his laptop computer and the information contained on the laptop computer should be suppressed.

Because a defendant is entitled to *Miranda* warnings only when there is a custodial interrogation,[4] the Court must determine whether the Defendant was "in custody" for *Miranda* purposes during the interview at the fire station, in Detective Loyko's patrol car and at Defendant's residence.

In order to be deemed "in custody" it is not necessary that a defendant be formally arrested. Rather, "[I]n order for a court to conclude that a suspect is in custody, it must be evident that, under the totality of circumstances, a reasonable man in the suspect's position would feel a restraint on his freedom of movement fairly characterized as that 'degree associated with a formal arrest' to such extent that he would not feel free to leave."[5] Notably, the test is not subjective but rather is an objective test and thus "[t]he only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation."[6] Therefore, neither the subjective mind set of the Defendant nor the intent of the Detectives are relevant to the determination of whether the interrogation was custodial. Nor is the fact that the investigation had solely focused on the Defendant, relevant to whether *Miranda* warnings should have been triggered.[7]

With these concepts in mind, the Court must determine whether a reasonably

---

[4] Miranda, 384 U.S. at 444, 86 S.Ct. at 1612.

[5] United States v. Phillips, 812 F.2d 1355, 1360 (11th Cir. 1987).

[6] Berkemer v. McCarty, 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984).

[7] Phillips, 812 F.2d at 1360.

innocent man[8] in Defendant's position during the questioning on April 9, 2008 would have felt that his freedom of movement was restrained to such an extent that the Defendant did not feel free to leave. Upon due consideration of the totality of the circumstances incident to the questioning of the Defendant, the Court concludes that the questioning of the Defendant by Detective Loyko and Detective Dunlap was not custodial for *Miranda* purposes.

As an initial matter, Defendant takes issue with Detective Loyko's decision to interview Defendant at the fire station, apart from his fiancee and co-workers as well as his decision to misrepresent the reason the Detectives were at the fire station. At the hearing, Detective Loyko explained that due to the nature of the allegations and because they had not yet confirmed Defendant's involvement, the Detectives did not want to tell Defendant's supervisors and co-workers the reason they were actually there. While the Detectives had linked the pornographic images to Defendant's residence, they were not sure if Defendant was responsible for the uploaded pornographic images, or whether someone else at his residence was responsible. These tactical decisions were reasonable and certainly did not render the interview of Defendant custodial.

During the course of the interview, Defendant repeatedly was advised that he was not under arrest.[9] The transcript of the interview at the fire station and in the patrol

---

[8] In United States v. Moya, 74 F.3d 1117, 1119 (11th Cir. 1996) the Eleventh Circuit observed that '[u]nder the objective standard, the reasonable person from whose perspective 'custody' is defined is a reasonable innocent person."

[9] United States v. Brown, 441 F.3d 1330, 1348 (11th Cir. 2006)("the fact that an individual is told he is not under arrest and is free to leave is a fact of substantial importance in determining whether a reasonable person would have felt free to leave.")

car shows that Detective Loyko told Defendant at least five times that he was not under arrest. Detective Loyko explained that if he wanted to arrest Defendant he "would've come in here and arrested [Defendant] off the top of the bat." This statement (as well as other statements) underscore the fact that it should have been evident to an individual in Defendant's position that at that point his freedom of movement was not restricted by being under arrest.

In addition, there was no evidence presented suggesting that a reasonably innocent man would have felt that his movement was restricted. To the contrary, there were several compelling circumstances which vividly highlight that Defendant's freedom of movement was not restricted. As an initial matter, the majority of the questioning occurred in the familiar setting of the fire station. Courts are "much less likely to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings."[10]

Additionally, there is nothing to suggest that Defendant's movement was restricted in any fashion. While Defendant was questioned in the weight room the door was unlocked and the exit was not blocked. Indeed, Defendant freely exited the weight room, walked out the door into the garage and left the building to talk on the phone in the parking lot. Once outside, Defendant continued to move around freely in the parking lot and went back inside the fire station on two occasions, without permission or an escort. Furthermore, Defendant chose to ride in Detective Loyko's patrol car instead of driving himself in his own vehicle. Defendant rode in the front seat and freely spoke

---

[10] United States v. Brown, 441 F.3d 1330, 1348 (11th Cir. 2006)(quoting United States v. Ritchie, 35 F.3d 1477, 1485 (10th Cir. 1994.)

on the phone with Ms. Falconer.  When they arrived at Defendant's residence, Defendant himself opened the door of the patrol car and went inside unescorted to see Ms. Falconer.   Once inside the residence, Defendant primarily sat in the family room and there was no evidence presented that he was confined while in the family room of his residence.

Nor were there any overt actions by the agents, which would draw into question that Defendant's movement was restricted. While both Detectives were wearing a firearm, there is no evidence that they ever touched or brandished the firearm. The Defendant was never restrained by handcuffs nor did the Detectives ever threaten to do so at any time.  Moreover, there is no suggestion that the Detectives yelled at Defendant or resorted to physical or psychological pressure of any sort in order to obtain the statements from Defendant.

At the hearing, Defense counsel focused on the fact that Detective Loyko believed he had probable cause to arrest Defendant at some point during the questioning at the fire station.  However, because there is no constitutional right to be arrested, a suspect cannot complain that officers postponed arresting him in order to obtain more incriminating statements or other evidence against him. *See, United States v. Street,* 472 F.3d 1298, 1309 (11th Cir. 2006.)  Accordingly, at what point Detective Loyko had probable cause to arrest Defendant has no bearing on whether the questioning was custodial.

Simply put, there was nothing to suggest that the Defendant's freedom of movement was restricted so that the interview could be deemed custodial in nature.  If anything, it appears that Defendant continued to cooperate, not because he was

coerced, but because he was hoping for leniency.[11] During the questioning, Defendant was focused on doing whatever he had to do so that he would not lose his house, wife, family and career. (T. 41, 54.)

Accordingly, the totality of the circumstances show that a reasonable person in the Defendant's position would not have felt a restraint on his freedom to a degree associated with a formal arrest. As such, the Court concludes that the interrogation of Defendant was not sufficiently custodial to trigger the obligation to provide *Miranda* warnings and, accordingly, the statements made by the Defendant and the evidence contained on the laptop computer should not be suppressed.

### IV.  Recommendation

In view of the foregoing, it is respectfully **RECOMMENDED** that Defendant's Motion To Suppress (Doc. 12) be **DENIED.**

**IN CHAMBERS** at Ocala, Florida this 21st day of November, 2008.

*[signature]*
GARY R. JONES
United States Magistrate Judge

Copies to:

    Honorable Wm. Terrell Hodges
    Senior United States District Judge

    U.S. Attorney (Armstrong, Hale)
    Counsel for Defendant

---

[11] See United States v. Long, 866 F.2d 402, 405 (11th Cir. 1989)(finding Defendant's statements were constitutionally obtained and voluntarily given where it appeared Defendant was simply hoping for leniency.)